**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHRISTINE M. PRESNELL,
Plaintiff-Appellant,

v.                                                              No. 98-1526

COLLINS & AIKMAN CORPORATION,
Defendant-Appellee.

Appeal from the United States District Court
for the Western District of North Carolina, at Shelby.
Lacy H. Thornburg, District Judge.
(CA-97-174-4-T)

Argued: March 4, 1999

Decided: May 24, 1999

Before NIEMEYER and WILLIAMS, Circuit Judges, and
SMITH, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Phyllis Ann Palmieri, Morganton, North Carolina, for
Appellant. Charles K. Howard, Jr., LITTLER MENDELSON, P.C.,
Atlanta, Georgia, for Appellee. **ON BRIEF:** Jill W. Richburg, LIT-
TLER MENDELSON, P.C., Atlanta, Georgia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Christine M. Presnell appeals an order of the district court granting summary judgment to Collins & Aikman, Corp. ("C&A") on her claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. §§ 621-34 (West 1985 & Supp. 1998), as well as on her related state law claims. Finding no error, we affirm.

I.

Prior to her discharge, Presnell, who was fifty-four years old at the time of her termination, worked at C&A's Old Fort, North Carolina plant, which manufactures carpets for various automobile companies. From the time she was hired in 1966 until 1983, Presnell was employed as a production line worker. In 1983, she was promoted to a supervisory position on the mold line. At the time of her discharge in June, 1996, Presnell had been with the company for just over thirty years.

Following a plant-wide employee survey in 1993, Presnell received and signed a Supervisor Development Plan in April, 1994. This plan told Presnell that her performance as a supervisor was unsatisfactory, and was designed to help Presnell improve her performance. The plan advised her that it was designed to give constructive criticism and provide goals for improving her performance. Presnell was also advised that failure to comply with the expectations contained within the plan could lead to her termination. As part of the effort to improve her interpersonal skills, identified as a weakness in the 1993 survey, Presnell also attended a Dale Carnegie course at C&A's expense. These actions were taken under the direction of Presnell's immediate supervisor at the time, Mike Miller.

Although her communication skills showed an initial improvement following the course, Presnell was issued an "Employee Relations

2

Report" in October, 1994, at the six-month review point of her Supervisor Development Plan. The report discussed various incidents that had occurred between Presnell and her subordinates, as well as a complaint filed by one of her supervisors, during the period of time leading up to the report. After she received and was counseled on this report, Presnell, who was previously on second shift, was transferred to third shift, where she was supervised by a different manager and would herself supervise different employees. Presnell was again counseled or disciplined by her supervisors relating to deficiencies in supervising and communicating with her subordinates in January and August, 1995. In October, 1995, Presnell was issued a verbal and written warning by her supervisors, at the time Chris Helms and Darryl Seals, for her attitude, conduct, and treatment of her subordinates.

In 1995, C&A instituted a new quality control plan called QS-9000, which was developed by automakers from the United States, Japan, and Europe to improve the quality and timing of parts received from suppliers such as C&A. A major goal of the quality control plan was to reduce the amount of inventory in the system between supplier and car manufacturer so that within hours, or ideally minutes, from the time the parts left the supplier they could be put into cars on the production line. This "just in time" delivery method that was part of QS-9000 placed a premium on correctly marked and produced items leaving the supplier. Supervisors, such as Presnell, had significant responsibilities under the quality control plan. Not only was Presnell required to teach and coach her supervisees in the implementation of the quality control plan, but she was also required to perform substantial quality checks every two hours. These periodic checks, known as "quality dam checks," consisted of placing a carpet on an inspection fixture located at the end of the assembly line and inspecting it for defects. If the carpet passed the inspection, Presnell then placed a quality dam sticker with her initials on the carpet, signifying that it met quality standards and was ready to be shipped to the customer. Presnell was also required to perform final "skid" checks, which consisted of checking every pallet of carpet produced during the shift to verify that it contained the correct number of carpet pieces and that the carpets met certain quality and specification standards. Presnell's approval of each pallet was signified by a red sticker with her initials placed on each pallet.

3

The record reveals that, in addition to being counseled on her communications skills and subordinate relations, Presnell also failed to perform her responsibilities under the QS-9000 system in a satisfactory manner. In March, 1995, Presnell was counseled by her supervisors for failing to discover that a pallet of carpet bearing her final check sticker had the wrong labels attached. In her deposition, Presnell admitted she committed this error and stated she did not believe the resulting disciplinary action was taken because of her age. On May 23, 1996, Presnell received a final written warning for again failing to perform quality dam checks and final skid checks. As with the earlier incident, Presnell again admitted that she failed to perform the proper quality checks. As part of the final warning, Presnell was told that further disciplinary action would be taken if the problem occurred again.

Six days after the May 23, 1996, incident, Presnell was given below average marks on her annual performance evaluation. On June 24, 1996, Presnell again committed serious errors in performing her quality checks. Presnell allowed Subaru labels to be attached to carpets for Ford Thunderbirds. In her deposition testimony, Presnell again acknowledged that she had failed to adequately perform the quality dam checks and that her approval sticker was attached to the mislabeled carpets. Because she was issued a final written warning approximately one month earlier for the same performance problem, Presnell was terminated by C&A later that day.

It is undisputed that Presnell never heard any of her immediate supervisors say anything she interpreted as expressing bias against older people. When asked whether she had ever heard anyone in the plant's management make disparaging comments about older workers, Presnell recalled no instance of such conduct.

In June, 1997, Presnell filed this action alleging that C&A discharged her because of her age, rather than her job performance, in violation of the ADEA.[1] Following discovery, the district court granted C&A's motion for summary judgment. This appeal followed.

_____

[1] Presnell also claimed that her discharge was in violation of the public policy of the state of North Carolina and that she suffered intentional infliction of emotional distress.

4

II.

An order of the district court granting summary judgment is reviewed <u>de novo</u>. <u>Nguyen v. CNA Corp.</u>, 44 F.3d 234, 236 (4th Cir. 1995). In doing so, all reasonable inferences are drawn from the evidence in the light most favorable to the nonmoving party in order to determine whether any material issues of fact exist for trial. <u>Id.</u> at 236-37.

In order to prevail in this action, Presnell must show that but for C&A's discriminatory intent, she would not have been discharged. <u>See Mitchell v. Data Gen. Corp.</u>, 12 F.3d 1310, 1314 (4th Cir. 1993). Presnell may prove this either through direct evidence that C&A discharged her because of her age, or through the use of the burden-shifting analysis established by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Because Presnell has not offered any direct evidence of age discrimination by C&A, we examine her case under the <u>McDonnell Douglas</u> framework.

In applying the framework, an employee must first establish a prima facie case, which raises a rebuttable presumption of discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802. Defendant may rebut this presumption by offering a legitimate, nondiscriminatory reason for the adverse employment action against the employee. <u>EEOC v. Clay Printing Co.</u>, 955 F.2d 936, 941 (4th Cir. 1992). After the employer meets this burden of production, the inference of age discrimination is effectively rebutted and the burden of production then shifts to plaintiff to establish by a preponderance of the evidence that the proffered reason was a pretext for age discrimination. <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981); <u>Clay Printing Co.</u>, 955 F.2d at 941.

To make out a prima facie case of age discrimination, Presnell must show that:

> (1) [she] was in the age group protected by the ADEA; (2) [she] was discharged or demoted; (3) at the time of [her] discharge or demotion, [she] was performing[her] job at a level that met [her] employer's legitimate expectations; and

5

> (4) [her] discharge occurred under circumstances that raise
> a reasonable inference of unlawful age discrimination.

Halperin v. Abacus Technology Corp., 128 F.3d 191, 196 (4th Cir. 1997). The district court found that Presnell did not establish a prima facie case because the evidence demonstrated that Presnell was not performing up to her employer's legitimate expectations, and because there were no circumstances giving rise to an inference of discrimination. However, even if we assume that Presnell established a prima facie case of age discrimination, her claim still fails as a matter of law under the McDonnell Douglas framework.**2**

C&A asserted that Presnell was discharged because of her poor job performance, which was documented in the record. Specifically, C&A explains that Presnell's repeated failures to properly carry out the quality checks required by the QS-9000 system compromised the plant's ability to provide "on time" products to its customers, and was the immediate reason for her termination. C&A also relies on Presnell's lengthy history of interpersonal and supervisory problems dating back to 1993 as an exacerbating factor. Presnell maintains that C&A's articulated rationale is pretextual.

To demonstrate pretext, however, Presnell must prove that C&A's proffered legitimate nondiscriminatory reason was false and that age discrimination was the real motivating factor behind her discharge. Id. at 201 & n.15. Presnell asserts that C&A engaged in a protracted, three-year effort to build a record of poor performance against her, solely to justify firing her before she reached the crucial retirement milestone of thirty years of service and age fifty-five, beyond which time she would qualify for a substantial increase in retirement benefits. According to Presnell, she was discharged because she would be

_____

**2** The parties in their briefs and at oral argument addressed the issue of whether the reasons offered by C&A for Presnell's termination were pretextual. Given the overlap of the facts in this case between the "employer's legitimate expectations" for a prima facie case, and the "legitimate nondiscriminatory reason" for the termination, we will proceed to address Presnell's claim under the full McDonnell Douglas framework. The outcome of the case, however, does not change.

the first employee at the Old Fort plant to reach this important milestone.

Presnell attempts to demonstrate the pretextual nature of C&A's nondiscriminatory reason by first asserting that the record does not support a finding of poor performance. In support of this argument, Presnell points to her final, post-discharge evaluation, asserting that she received above average marks in two out of seven categories, while only receiving an unsatisfactory in one category. Presnell fails to mention, however, that her final evaluation also contained below average marks in two additional categories, thus making her overall performance below average. Presnell's final evaluation was entirely consistent with the annual evaluation she received a month before her discharge, in which she received an overall score of below average and was consistently ranked average to below average in all but one category.

Presnell next claims that because the disciplinary reports she received were subjective in nature, they demonstrate a pattern of discrimination against her because she received them from much younger supervisors, Helms and Seals. Presnell asserts that she was targeted by Helms and Seals because of her age, and blames many of her problems on her position as third shift supervisor, where she was supervising line workers much younger than herself. However, the evidence is clear that Presnell's history of disciplinary problems predated her move to the third shift and her contact with Helms as her immediate supervisor. The record is clear that communication problems first surfaced as a result of a survey conducted in 1993. Presnell was counseled and advised on these issues numerous times while she was a supervisor on the second shift, before she was moved to the third shift. In fact, the move to the third shift was made to allow Presnell a chance to start over with new supervisees and a new supervisor. Unfortunately, the second chance did not work. Presnell continued to have problems with her interpersonal skills and management techniques, compounded by the introduction of a new quality assurance regime with which Presnell had difficulty.

The fact that Presnell was of the opinion that corrective action was unnecessary and there were some favorable performance indicators, along with other unfavorable indicators, is not sufficient to establish

7

that C&A's proffered reason was pretextual. See Lovelace v. Sherwin Williams, 681 F.2d 230, 246 (4th Cir. 1982) (holding that such evidence does not demonstrate pretext because "[s]uch a leap of inference could only be by rank speculation and not by any rational processes of inference"). More importantly, not all of the disciplinary reports that Presnell received were subjective in nature. The record contains a number of well-documented occasions where Presnell falsely verified that various quality dam and final skid checks were performed. Moreover, Presnell admitted each and every one of these violations, which resulted in written reprimands and her eventual termination.

Presnell also claims that younger supervisors, or those with substantially less time with the company (and thus not near the 55/30 benefit mark) received similar disciplinary action as Presnell, but were not fired. However, there is nothing in the record to support these assertions, other than Presnell's own speculative, unsubstantiated statements. Presnell also claims that her replacement, Tom Farr, had a substantial record of violations and "bad mouthing" the company. Again, this assertion is not supported by the record.

Because Presnell failed to demonstrate the existence of a genuine issue of material fact with respect to whether C&A's nondiscriminatory reasons for her discharge were a pretext for age discrimination, the district court did not err in granting summary judgment to C&A.

III.

The district judge also granted summary judgment on Presnell's cause of action for wrongful discharge in violation of North Carolina public policy. Because North Carolina has adopted the same standards of proof and burden shifting analysis in state law discrimination cases as in federal discrimination cases, North Carolina Dep't of Corrections v. Gibson, 301 S.E.2d 78, 82, 85 (N.C. 1983), and Presnell presents the same evidence to support both the ADEA and state law wrongful discharge claim, the district court also properly granted summary judgment on this claim. See Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir. 1995) (affirming grant of summary judgment on employment action in violation of North Carolina public pol-

8

icy where plaintiff relied on same evidence to support state law claim as she did for her ADEA claim).

Finally, the district court also dismissed Presnell's cause of action for intentional infliction of emotional distress. We find no error in the lower court's ruling. Presnell was not subjected to conduct that was extreme or outrageous. See Hill v. Kinston, 374 S.E.2d 425, 426 (N.C. Ct. App. 1988) (extreme or outrageous conduct is essential element of cause of action for intentional infliction of emotional distress). Moreover, there is no showing that C&A, or its agents, intended to inflict any type of emotional distress on Presnell, and there is no evidence that Presnell suffered emotional distress of the severity required to state such a cause of action under North Carolina law. See Waddle v. Sparks, 414 S.E.2d 22, 27 (N.C. 1992) (holding that defendant's actions must have caused "neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so"). The record demonstrates that Presnell's termination was handled responsibly. See Hill , 374 S.E.2d at 426 (holding that dismissal of employee did not give rise to cause of action for intentional infliction of emotional distress claim when "the process of plaintiff's dismissal was carried out in a responsible manner").

IV.

Because Presnell failed to establish the existence of a genuine issue of material fact with respect to any of her causes of action, the district court did not err in granting summary judgment to Collins & Aikman.

AFFIRMED

9